# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A., a Maryland professional association, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. 1:22-cv-02129-BPG |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF HILLEL TENDLER

I, Hillel Tendler, declare under the penalty of perjury as follows:

1. I am over eighteen years of age, of sound mind and capable of making this declaration, and am personally acquainted with the facts set forth below.

2. I am a shareholder of the law firm of Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. ("NQGRG"). I am a lawyer and am admitted to practice law in Maryland and New York.

3. NQGRG is headquartered in Baltimore, Maryland and has existed for more than thirty years. NQGRG is a professional association formed pursuant to the laws of the State of Maryland.

4. NQGRG has more than thirty attorneys practicing in different areas of the law, including business planning, real estate, estates and trusts, litigation, and taxation.

5. NQGRG has eighteen (18) shareholders and officers, as well as four (4) duly appointed directors. All significant decisions concerning the operations of NQGRG are resolved by its directors, officers, or shareholders in accordance with NQGRG's governing documents and/or applicable corporate law of Maryland.

6. NQGRG generates income by billing and collecting for services rendered to legal clients.

7. NQGRG maintains an operating account which accepts payments for services rendered and which is used to make payments relating to the operation of the business. NQGRG also uses this account to pay its employees and shareholders. The operating account for NQGRG is maintained at PNC Bank and has an account number ending in *1561.

1

8. NQGRG accepts deposits directly from clients or from third parties into its attorney trust account. NQGRG does not commingle these funds with its operating account or its own funds. NQGRG maintains separate accounting for each client with funds in its attorney trust account. The attorney trust account for NQGRG is maintained at PNC Bank and has an account number ending in *5364.

9. NQGRG has filed all federal corporate income tax returns and has paid all associated taxes to the Internal Revenue Service.

10. Lehcim Holdings, Inc. ("Lehcim") is a Maryland corporation that was incorporated by attorneys of NQGRG in 2001.

11. Lehcim was incorporated on behalf of Michel Konig, an individual client of NQGRG.

12. Michel Konig and members of his immediate family are, and have always been, the beneficial owners of Lehcim. Lehcim is wholly owned by a corporation of the British Virgin Islands, which is in turn owned by a Maryland trust, of which the beneficiaries are Michel Konig and/or members of his immediate family.

13. NQGRG renders business and tax advice to Michel Konig and Lehcim.

14. Lehcim filed Articles of Incorporation with the State of Maryland and has corporate bylaws.

15. Since its inception, Lehcim has filed its annual personal property tax returns and its annual income tax returns. Lehcim is a corporation in good standing in the State of Maryland.

16. Lehcim uses the same business address as NQGRG on its income tax returns, pursuant to instructions from Michel Konig and for administrative convenience.

17. Lawyers employed by NQGRG, including myself, serve as the officers of Lehcim and other entities owned or controlled by Michel Konig, pursuant to instructions from Michel Konig and for administrative convenience. All decisions of Lehcim are based on directions from Michel Konig.

18. NQGRG is neither a shareholder of Lehcim nor is it a parent company of Lehcim.

19. None of NQGRG's shareholders are shareholders of Lehcim.

20. NQGRG does not have any economic interest in Lehcim.

21. The Internal Revenue Service subjected Lehcim, and other businesses in which it held an interest, to an income tax examination.

22. A partnership in which Lehcim was a partner, Ramat Associates, another entity beneficially owned by Michel Konig and his immediate family, ultimately disputed some of the adjustments proposed in its income tax examination to the United States Tax Court.

23. The adjustments that Ramat Associates disputed related to the tax years of 2006 through 2008 and involved both the (1) the disallowance of a deduction for a write-off of a worthless receivable made in connection with a residential real estate project in Israel and (2) the disallowance of a deduction relating to a loss on the settlement of a foreign liability.

24. Lehcim, as a party to the litigation involving partnership adjustments of Ramat Associates, agreed that the adjustments were subject to penalties for negligence, disregard of rules or regulations, and/or substantial understatement of income

25. In the litigation involving Ramat Associates and thereafter, the Internal Revenue Service has never contended that the adjustments were attributable to fraud of that partnership, its partners, or anyone else.

26. In the litigation involving Ramat Associates, the Internal Revenue Service acknowledged that Lehcim was owned by a non-U.S. person. Michel Konig is a non-U.S. person as are the entities that own Lehcim on his behalf.

27. The Internal Revenue Service has never asserted that Lehcim or anyone involved with the preparation of its tax returns engaged in any fraudulent conduct with respect to positions taken on its tax returns.

28. Separate from the examination and litigation involving Ramat Associates, the Internal Revenue Service also examined and disallowed other tax deductions claimed by Lehcim on its tax returns for 2010 through 2015. Those deductions were significant and primarily related to interest expense and loss carryforwards.

29. As a result of that examination, the Internal Revenue Service assessed additional tax, accuracy-related penalties, and late filing penalties against Lehcim.

30. In addition to the adjustments specifically relating to Lehcim, the adjustments resulting from the litigation involving Ramat Associates also had the ultimate effect of increasing Lehcim's taxable income. Although the statute of limitations expired for the years 2006 through 2008, the adjustments resulted in significant disallowances of net operating losses and loss carryforwards to later tax years for Lehcim.

31. Tax liabilities owed by Lehcim for the years of 2010 and thereafter are directly attributable to not only the disallowance of its own deductions claimed on tax returns for 2010 through 2015, but also to the disallowance of claimed net operating loss carryforwards that were pass-through items attributable to its interest in Ramat Associates relating to the years 2006 through 2008.

4858-2661-8693, v. 1

32. Other than providing legal counsel to Lehcim, NQGRG did not have any involvement in the transactions giving rise to these income tax adjustments. None of the income tax adjustments had any financial impact on NQGRG and no funds of NQGRG were involved in the related transactions.

33. Many of the employees of the Internal Revenue Service that were involved in the examination of Lehcim, as well as the litigation involving Ramat Associates, are the same employees involving in collecting the tax liability from Lehcim and, ultimately, issuing the alter ego levy against NQGRG.

34. The litigation relating to Ramat Associates was not concluded until September 2020. None of the adjustments of Lehcim, which related to items from Ramat Associates, could be assessed and collected until after the conclusion of the matter involving Ramat Associates.

35. On May 12, 2022, the Internal Revenue Service served a Notice of Levy on PNC Bank, directed towards the bank accounts of "Neuberger, Quinn, Gielen, Rubin & Gibber P.A., Alter Ego of Lehcim Holdings, Inc.," to satisfy various tax liabilities of Lehcim in the aggregate amount of $1,543,929.29.

36. NQGRG did not receive a Notice of Levy from the Internal Revenue Service and was only informed of the action by PNC Bank. Those amounts levied by the Internal Revenue Service were immediately frozen by PNC Bank and are not available to NQGRG.

37. On June 2, 2022, NQGRG filed an administrative appeal with the Internal Revenue Service in order to contest the validity of the alter ego levy and to have the funds seized from its operating account returned.

38. During the administrative appeal with the Internal Revenue Service, representatives of the Internal Revenue Service stated that NQGRG did not have access to Collection Due Process rights on the premise that NQGRG and Lehcim were separate taxpayers.

39. During the administrative appeal, representatives of the Internal Revenue Service stated that NQGRG was not entitled to receive a Notice of Levy because NQGRG and Lehcim were separate taxpayers.

40. During the administrative appeal in the Collection Appeals Program, the Internal Revenue Service did not provide NQGRG with any documentation concerning the theory or basis for its alter ego levy and indicated that such information was protected from disclosure because it contained confidential "return" information of another taxpayer – Lehcim.

Date: December 21, 2022

_____
Hillel Tendler