**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | | **Civil Action No. EA-22-2129** |
| | * | |
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Defendant.** | * | |

**MEMORANDUM OF DECISION**

Plaintiff Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. (NQGRG) initiated this action on August 23, 2022, challenging a tax levy and seeking injunctive and monetary relief, damages, and costs pursuant to 26 U.S.C. § 7426.  ECF No. 1.  The Court previously granted Defendant United States of America's motion for partial summary judgment and denied NQGRG's summary judgment motion.  ECF No. 87; *Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, Civil Action No. EA-22-2129, 2024 WL 3234000, at *5 (D. Md. June 28, 2024) (*NQGRG I*), *reconsideration denied*, 2025 WL 659546 (D. Md. Feb. 28, 2025); *see also* ECF Nos. 102–103. The Court held a bench trial on NQGRG's wrongful levy claim on February 19-20 and 24-25, 2026.  Following trial, the parties filed proposed findings of fact and conclusions of law, and the Court heard closing arguments on April 7, 2026.  ECF Nos. 151–154.  Pursuant to Federal Rule of Civil Procedure 52, this Memorandum of Decision sets forth the Court's findings of facts and conclusions of law.  For the reasons set forth below, the Court enters judgment in favor of NQGRG and against the United States in the amount of $1,543,929.29.  Interest shall accrue on this amount at the overpayment rate established under 26 U.S.C. § 6621(a)(1) from June 3, 2022, to the date of payment of the judgment.  26 U.S.C. § 7426(g)(1).

## I.     INTRODUCTION

Rule 52 requires that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a).  "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  *Id.*  "In doing so, the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate the credibility of the witnesses, weigh the evidence, and choose among conflicting inferences and conclusions."  *Brooks* v. *United States*, Civil Action No. TJS-21-1029, 2023 WL 6599008, at *1 (D. Md. Oct. 10, 2023).  Rule 52(a) does not, however, "require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient."  *Darter* v. *Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (internal quotation marks omitted).  Thus, the Court sitting as factfinder "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'"  *Wooten* v. *Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008), *aff'd*, 350 Fed. Appx. 812 (4th Cir. 2009) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment).

## II.     FINDINGS OF FACT

The Court makes the following findings of fact based on the stipulated facts, relevant documentary and testimonial evidence introduced at trial, as well as any reasonable inferences and credibility assessments drawn therefrom.

### A.     NQGRG and its Principals

NQGRG is a law firm based in Baltimore, Maryland, that was founded in 1989 as a successor to another Baltimore law firm.  ECF No. 127-1 ¶ 2; ECF No. 149 at 22:8–10, 133:1–2. NQGRG is organized as a professional association, which "is an entity created by a group of

licensed individuals to conduct business under the authority of the state."  ECF No. 127-1 ¶ 2

& 3 n.3; ECF No. 147 at 157:11–18.[1]  NQGRG is owned by its principals, who "function like

partners in professional partnership law firms."  ECF No. 127-1 at 3 n.3; ECF No. 147 at 158:7–

9; ECF No. 148 at 158:11–12.  NQGRG has approximately 20 principals.  ECF No. 149

at 159:5–6.  Day-to-day decisions are made by NQGRG's management committee, whereas

major decisions are generally made by consensus at meetings of the NQGRG principals.  ECF

No. 148 at 158:15–18; ECF No. 149 at 115:14–15, 159:13–19.  NQGRG has bylaws, articles of

incorporation, and files its own tax returns.  ECF No. 148 at 158:19–24.

NQGRG provides legal services in the practice areas of "corporate transactional mergers,

acquisitions, securities, real estate, trust and estate litigation, and tax."  ECF No. 148 at 159:2–5.

NQGRG generates income from billing its clients for the legal services it provides.  ECF No. 147

at 158:25–159:5.  NQGRG has an operating account, which it uses to fund the operations of the

law firm, such as payroll, rent, utilities, insurance, etc.  ECF No. 147 at 159:6–14, 167:20–25;

ECF No. 149 at 122:25–123:3.  The money in NQGRG's operating account comes from the

payment of legal fees by clients and is owned by the professional association and, ultimately, the

principals.  ECF No. 148 at 168:4–5; ECF No. 149 at 123:4–18, 160:22–25.  None of NQGRG's

clients have an interest in its operating account.  ECF No. 149 at 161:1–3.

NQGRG also has an interest-only lawyer's trust account (IOLTA), in which it holds

money that belongs to the firm's clients.  ECF No. 148 at 159:15–160:16.  "Pursuant to

Maryland law, attorneys are permitted to hold funds on behalf of their clients within an . . .

IOLTA[ ], sometimes referred to as an attorney escrow account.  Since funds of multiple clients

---

[1]  Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files (CM/ECF) system printed at the top of the cited document, except that references to the trial transcript include both the transcript page and line numbers and references to exhibits include both the exhibit number and, as applicable, the bates number of the referenced page(s).

3

are held within an IOLTA, lawyers are required to independently track and reconcile funds held on behalf of clients." ECF No. 127-1 ¶ 76. NQGRG has "no ownership interest whatsoever" in its IOLTA account. ECF No. 149 at 161:12–13. NQGRG does not comingle the funds in its operating and IOLTA accounts. *Id.* at 162:5–7.

Issac Neuberger is a principal and a founding member of NQGRG. ECF No. 127-1 ¶ 1; ECF No. 149 at 114:22–24. The focus of Mr. Neuberger's practice is estate planning, tax planning, corporate work, and litigation on behalf of families and entities. ECF No. 149 at 22:17–20. Michael Quinn is also a founding member of NQGRG. *Id.* at 131:21–22. Mr. Quinn's practice at NQGRG has "primarily been business transactions, . . . mergers and acquisitions . . . , general business, [and] business deals." *Id.* at 133:6–9. Thomas Wood joined NQGRG in 1992 and is presently a principal of the firm, a member of the management committee, and the head of litigation. *Id.* at 158:4–5, 159:3–4, 159:22–23. Mr. Wood also functions as NQGRG's unofficial general counsel and handles ethics issues. *Id.* at 159:24–160:1. Hillel Tendler is a principal of NQGRG, where he has worked since 2000. ECF No. 127-1 ¶ 3; ECF No. 148 at 86:2–10.

### B.     Michel Konig

"Since at least 2000, NQ[GRG] has represented Michel Konig (a foreign national) and his family in a wide range of transactional matters, including business planning, investments, and tax planning." ECF No. 127-1 ¶ 5. Mr. Konig is the main spokesperson for the Konig family. ECF No. 147 at 163:14–17. Throughout NQGRG's representation of the Konig family, Mr. Neuberger has been Mr. Konig's relationship principal. ECF No. 127-1 ¶ 6. This means that Mr. Neuberger "brought the client into the firm and maintains the relationship with the client." ECF No. 148 at 86:21–87:2. Mr. Neuberger and his NQGRG colleagues have "done a number of business transactions for [Mr. Konig] and his family, the enterprise." ECF No. 149 at 23:14–

4

24:1.  Mr. Quinn explained that Mr. Konig is one of a group of clients who "have been involved in a lot of nursing home-related deals."  *Id.* at 135:1–3.  When Mr. Konig "negotiates a transaction," NQGRG provides legal advice and "does the legal work necessary to create structures at [his] direction."  *Id.* at 34:11–13, 35:3–5.  In particular, NQGRG attorneys, in conjunction with the Konig family's European counsel, "form[ ] entities . . . to participate in investments" and work on the Konig family's tax planning.  ECF No. 148 at 88:11–14, 160:2–7.  "Very often," "there would be various entities" that NQGRG or the Konig family's European counsel had formed, and "the ultimate owner would be a trust."  *Id.* at 88:15–22.  The structuring of organizations was designed to be "the most efficient tax way to make . . . an investment."  *Id.* at 160:12–14.  Mr. Konig made the decisions as to how to structure the entities based on advice from NQGRG.  *Id.* at 160:15–24.

### C.    Lehcim Holdings, Inc.

####    1.    Incorporation, Officers/Directors, Ownership

On behalf of Mr. Konig, NQGRG attorneys prepared articles of incorporation, effective February 27, 2001, for the Maryland corporation Lehcim Holdings, Inc. (Lehcim).[2]  ECF No. 127-1 ¶ 7; Joint Exhibit (JX)-001.  Among other things, Lehcim's articles of incorporation identify Mr. Neuberger as Lehcim's sole director, Mr. Tendler as the resident agent, and NQGRG's office as Lehcim's principal place of business.  ECF No. 127-1 ¶ 8; JX-001.  Lehcim's principal place of business has always been NQGRG's office, and Mr. Neuberger and Mr. Tendler are the only two individuals who have held any position with Lehcim.  ECF No. 127-1 ¶¶ 8, 14.  Mr. Tendler testified that Lehcim used NQGRG's address because Mr. Konig did not have an address in the United States.  ECF No. 148 at 162:12–14.

---

[2]  "Lehcim" is Michel Konig's first name spelled backwards.  ECF No. 147 at 162:25–163:5.

Lehcim adopted bylaws on December 17, 2002.  JX-004.  Among other things, the bylaws provide that Lehcim would have an annual meeting of stockholders of the corporation. ECF No. 147 at 58:8–16; JX-004 at 0011.  Lehcim did not hold formal board meetings or shareholder meetings, but it kept books and records, including records of its agreements.  ECF No. 149 at 51:11–52:2; *see also* II.C.3, *infra* (discussing Lehcim's books and records).  Mr. Neuberger explained that "routinely in these kind[s] of entities you would have neither meetings nor shareholder meetings."  ECF No. 149 at 52:1–2.

Also on December 17, 2002, through a document entitled "Consent of Sole Director," Mr. Neuberger appointed himself as Lehcim's president and treasurer and Mr. Tendler as vice president and secretary.  ECF No. 127-1 ¶ 16; JX-003.  Mr. Tendler and Mr. Neuberger serve as officers, and in the case of Mr. Neuberger, as director of Lehcim at Mr. Konig's request.  ECF No. 148 at 94:18–19, 161:11–13.  Mr. Neuberger has served as an officer, director, or trustee for over 1,100 entities (not all of which are Konig-related entities).  ECF No. 149 at 26:11–16. According to Mr. Neuberger, serving as a corporate officer or director is "a very common practice" and a "routine part of the service we provide" to "many, many clients."  *Id.* at 26:16– 17, 118:6–8.  Mr. Neuberger explained that this service is often provided as a convenience to the client when a client is "offshore" and "made investments in the United States" and may need "a wet signature."  *Id.* at 118:9–17.

Mr. Neuberger and Mr. Tendler are not separately compensated for their roles with Lehcim.  ECF No. 127-1 ¶ 19; ECF No. 148 at 94:23–25; ECF No. 149 at 33:6–9.  NQGRG bills Mr. Konig for the time Mr. Neuberger and Mr. Tendler spend performing duties associated with their positions as Lehcim's corporate officers and director.  ECF No. 127-1 ¶ 19; ECF No. 148 at 95:1–3; Defense Exhibit (DX)-006.  Mr. Konig does not pay his NQGRG bills in a timely manner.  ECF No. 148 at 103:2–3, 169:4–8; JX-032.  Even when Mr. Konig's payments are

"very overdue," NQGRG does not pay itself with IOLTA funds without the client's permission. ECF No. 148 at 169:14–18; ECF No. 149 at 126:12–19.

Lehcim's sole shareholder is Beauville Holdings, Ltd. (Beauville), a British Virgin Islands company. ECF No. 127-1 ¶ 10. Through a series of entities and trusts, the Konig family is the ultimate beneficial owner of Lehcim. ECF No. 147 at 115:25–116:3, 164:5–16; ECF No. 149 at 39:1–3; ECF No. 150 at 70:12–15; JX-040 at 0621. NQGRG, Mr. Neuberger, and Mr. Tendler are not owners, beneficial or otherwise, of Lehcim. ECF No. 127-1 ¶ 75; ECF No. 147 at 116:4–6, 165:19–24; ECF No. 148 at 66:21–24, 66:25–67:5; ECF No. 149 at 117:9–19, 162:8–13; ECF No. 150 at 70:22–71:5. Besides its interest in being paid legal fees for the work it did for Lehcim, NQGRG does not have any economic interest in Lehcim. ECF No. 147 at 166:4–7; ECF No. 150 at 71:11–14. NQGRG and Lehcim have an attorney-client relationship. ECF No. 149 at 162:20–22.

2.  Investments[3]

Lehcim is a holding company, meaning that it holds investments, which is a legitimate business activity. ECF No. 147 at 70:21, 108:21–109:8, 163:18–23; ECF No. 149 at 38:21–23. Lehcim does not have any business operations because it was intended to generate money from investments in partnerships and other entities.[4] ECF No. 147 at 70:16–19; ECF No. 148 at 162:10; ECF No. 149 at 52:15–17. "Lehcim was incorporated originally to be a partner in a partnership that owned commercial real estate in Philadelphia called One Penn Center." ECF

---

[3] The investments discussed in this section are merely examples and do not constitute the entirety of Lehcim Holdings, Inc.'s (Lehcim) investment activity.

[4] Lehcim was successful in its investment activity. For example, Barbara Strazzeri, a former Internal Revenue Service (IRS) employee testified that the IRS concluded that Lehcim had over $1.7 million dollars in taxable income in 2010. ECF No. 147 at 118:17-19; Joint Exhibit (JX)-051 at 0753. The IRS concluded that Lehcim had over $1.6 million dollars in taxable income in 2011. ECF No. 147 at 118:23-119:10; JX-051 at 0755.

No. 127-1 ¶ 13.  Lehcim was "an indirect partner" in One Penn Center "through the various partnerships" into which it had entered.  ECF No. 147 at 109:19–20.  Lehcim was created as a Maryland C corporation "for tax purposes" because "it was important for the investor in this transaction."  ECF No. 148 at 91:6–14.

"To fund its investment in One Penn Center, Lehcim borrowed $207,500 from . . . Beauville" in 2002.[5]  ECF No. 127-1 ¶ 25.  This loan was documented by a promissory note.  ECF No. 127-1 ¶ 26; JX-008.  Also in 2002, "Lehcim borrowed $850,000 from Nightingale Ventures, Ltd.[(Nightingale)], at an interest rate of 18% per year."[6]  ECF No. 127-1 ¶ 28.  This loan was also documented by a promissory note, which reflected that the entire amount of the loan, plus interest, was due April 1, 2012.[7]  *Id.* at ¶ 29; JX-007 at 0028.  Mr. Neuberger signed the promissory note on behalf of Nightingale with the authorization of a Nightingale principal.  ECF No. 149 at 93:22–94:4.  Mr. Neuberger testified that this authorization would have been communicated via a telephone call or email.  *Id.* at 94:10–12.  Lehcim did not repay the loan by the date identified in the promissory note.  ECF No. 127-1 ¶ 31.

Lehcim's investment in One Penn Center was successful and Lehcim received income as a result.  ECF No. 147 at 110:10–12, 18–19.  The money that Lehcim made from the One Penn Center investment was documented on NQGRG's client-matter trust ledger.  *Id.* at 111:22–112:2.  In 2005, Lehcim divested its interest in One Penn Center.  ECF No. 127-1 ¶ 30.

---

[5]  In 2011, the loan from Beauville Holdings, Ltd. was converted to a capital contribution. ECF No. 127-1 ¶ 27.

[6]  Nightingale Ventures Limited (Nightingale) is a British Virgin Islands company that was incorporated in 2001.  ECF No. 147 at 63:10–12, 64:1–12; Defense Exhibit (DX)-009 at 0440–0441.  Mr. Neuberger served as the director of Nightingale from March 14, 2002, to December 10, 2009.  DX-009 at 0442.

[7]  Additional promissory notes between Lehcim and Nightingale in the amounts of $18,000, $280,000, and $591,451.92 were entered into evidence.  ECF No. 127-1 ¶ 32; ECF No. 147 at 73:20–22, 75:25–76:2, 76:11–15; JX-009; JX-010; JX-011.

Lehcim was also a partner in the Ramat Associates (Ramat) partnership, along with Acan West 52, Inc. and Wil-Coser Associates.  ECF No. 147 at 129:18-22, 130:19-22; ECF No. 148 at 123:21–24; DX-013 at 0472.  Mr. Neuberger signed the partnership agreement on behalf of each of the three partners.  ECF No. 147 at 131:8–14; DX-013 at 0480; DX-128 at 1764.  The Ramat partnership agreement was dated as effective as of September 7, 2001, but it was not drafted or signed in 2001.  ECF No. 148 at 126:11–13, 127:24–128:1.  Mr. Neuberger testified that "[w]hatever the agreements were, they may not have been documented but the agreements were reached as of the date that they say they were reached."[8]  ECF No. 149 at 65:11–13.

Nearly twenty years ago, Mr. Neuberger, as an individual, was also a partner in Ramat. *Id.* at 74:4–21; DX-092 at 1397.  Mr. Neuberger explained that he had "tried to be a partner of Ramat because Mr. Konig offered to allocate certain losses to [him] in exchange for a . . . recourse note."  ECF No. 149 at 74:14–16.  Ultimately, the IRS disallowed his partnership interest and Mr. Neuberger had to pay additional taxes for the 2006 year.  *Id.* at 72:16–18, 74:13–14.  During this same timeframe, Lehcim was also a partner in Ramat and Mr. Neuberger was an officer and director of Lehcim.  *Id.* at 74:20–75:1.  Mr. Neuberger testified that Mr. Konig authorized him to be a partner in Ramat and that NQGRG knew of his role in this regard and "talk[ed] about it in a meeting."  *Id.* at 75:15–23.  Mr. Neuberger could not recall a specific meeting when that occurred and was not aware of any documentation of NQGRG's authorization.  *Id.* at 76:9–13.  Mr. Wood testified that NQGRG attorneys are not permitted to do business with or enter into partnerships with their clients.  *Id.* at 165:15–20.

---

[8]  In 2002, the Ramat Associates partnership agreement was amended to add Larts Trust, a British Virgin Islands trust, as a partner.  ECF No. 147 at 131:15–19; DX-013 at 0482.  Isaac Neuberger signed the amendment on behalf of all of the entities.  ECF No. 147 at 131:20–25; DX-013 at 0483.

Lehcim also entered into the L Gen Associates (L Gen) partnership, along with Gazelle Larts, LLC and Gazelle Salomon, LLC.  ECF No. 147 at 67:24–68:1; DX-020; *see also* ECF No. 149 at 139:20–140:21, 141:22–142:20 (Mr. Quinn testifying as to the background of Lehcim's role in the L Gen partnership and related business deals).  Mr. Quinn was involved in drafting the L Gen partnership agreement.  ECF No. 149 at 136:21–23.  Mr. Neuberger signed the partnership agreement on behalf of Gazelle Larts, LLC and Gazelle Solomon, LLC and Mr. Tendler signed on behalf of Lehcim.  DX-010 at 0606.  The Konig family is the beneficial owner of these entities.  ECF No. 148 at 142:10–11.  L Gen's investments generated funds that were distributed to Lehcim.[9]  *Id.* at 142:15–17.

One such investment was L Gen's indirect investment in Genesis Healthcare.  *Id.* at 142:18–19; ECF No. 149 at 76:19–21.  Genesis Healthcare is a nursing home company that was restructured.  ECF No. 149 at 76:24–25, 79:8–15; *see also id.* 143:16–149:9 (discussing the background of nursing home-related business deals).  Mr. Quinn testified that "these were very complicated deals."  *Id.* at 146:2.  NQGRG represented not just L Gen Associates, but a "whole group of investors."  *Id.* at 144:25–145:3.  Mr. Quinn "remember[ed] having lots and lots of fun with Excel spreadsheets trying to figure out who was entitled to what and going back and forth and reviewing this with the other people who had an interest in it and finally coming up with, okay, this is it."  *Id.* at 145:5–9.  Mr. Quinn further testified that all of the components of the L Gen partnership agreement "had been staked out" and "nailed down" "back in 2010" and were reflected in a "two-page memo" that he had written "laying out its structure," but he did not "get around to actually drafting [the partnership agreement] until 2013."  *Id.* at 146:22–147:7.

---

[9]  A 2010 Schedule K-1 issued by L Gen Associates reflects that Lehcim received a dividend of approximately $1.8 million.  ECF No. 149 at 79:19–24, 80:5–9; JX-017.  A 2011 Schedule K-1 reflects that Lehcim received over $3.78 million from L Gen Associates as a net long-term capital gain.  ECF No. 149 at 80:10–81:1; JX-018.

Mr. Quinn did not remember why the partnership agreement was not drafted until 2013, but said it was "[p]robably because [he] was busy doing other things." *Id.* at 147:19–22; *see also id*. at 148:10–14 ("[T]here were lots of other parts to this deal. . . . I spent a lot of time just trying to figure out what the other parties were supposed to get because they had so many different layers in this thing."). Mr. Quinn explained, "everyone knew what the deal was, so it wasn't like we needed that partnership agreement to tell us what to do. All I needed was my little two-page summary that I had written back in the summer of 2010." *Id.* at 148 at 5–9; *see also id*. at 152:12–15 ("Everybody knew what the terms of the deal were long before somebody said[,] hey, where's that document[?] I was like[,] oh, I don't know. You need it? Okay, I'll draft it."). Mr. Quinn testified that the partnership agreement was drafted to state that "the agreement was made as of . . . a date" because lawyers at NQGRG and at other law firms he has dealt with when doing business transactions "don't care when it was signed" but "do care . . . when it is effective because that's what's significant . . . to the deal." *Id.* at 150:10–151:3.

### 3.    Books and Records

Lehcim has articles of incorporation (JX-001), bylaws (JX-004), partnership agreements (ECF No. 148 at 162:1–2; ECF No. 149 at 56:16–25), and "organizational minutes" (Consent of Sole Director) that appoint officers and authorize certain actions (ECF No. 148 at 94:7–10; JX-003). Lehcim's bylaws "lay[ ] out the officerships, the officer positions," as well as "the powers and duties" of the officers. ECF No. 148 at 92:24, 93:5–13. NQGRG maintained a physical file folder for Lehcim matters, although some documents, such as the client-matter trust ledger, exist in electronic form only. *Id.* at 106:23–107:1, 107:15–18.

Lehcim has never had its own bank account. ECF No. 127-1 ¶ 20. Instead, it uses NQGRG's client trust account for deposits and withdrawals. *Id.*; ECF No. 148 at 105:6–10. NQGRG "holds mon[ies] for many, many clients, including the Konig enterprises" in its IOLTA.

ECF No. 149 at 27:16–17.  NQGRG logged Lehcim's financial transactions on a client-matter trust ledger.  ECF No. 127-1 ¶ 21; ECF No. 148 at 105:20–106:1; JX-013; JX-014.  The first entry on Lehcim's client matter trust ledger is November 23, 2010.  ECF No. 148 at 111:4–10; JX-013 at 0083.  Loans were often documented with a promissory note or other written notation.  *E.g.*, JX-007; JX-008; JX-012.  Mr. Konig authorized all movement of Lehcim's money in NQGRG's IOLTA.  ECF No. 149 at 125:14–16.

Joseph Leshkowitz is a certified public accountant and partner in Leshkowitz and Company (Leshkowitz & Co.), a New York based entity that provides accounting, bookkeeping and tax services for "many of the [Konig-related] entities and instrumentalities and structures."  ECF No. 149 at 26:25–27:7; *see also* ECF No. 127-1 ¶ 18; ECF No. 148 at 163:15–20; ECF No. 150 at 32:7–12, 67:14.  At the end of each tax year, Leshkowitz & Co. uses NQGRG's client-matter trust ledgers to prepare the balance sheets reported on Schedule L of Lehcim's income tax returns.  ECF No. 127-1 ¶ 22; ECF No. 147 at 171:7–13; ECF No. 150 at 36:11–17, 38:8–25, 67:20–23.  Mr. Leshkowitz testified that balance sheets, which are "a listing of the assets and liabilities and capital of a company," are business records.  ECF No. 150 at 35:22–36:1.  Either Mr. Neuberger or Mr. Tendler signed Lehcim's income tax returns for years 2010 through 2020.  ECF No. 127-1 ¶¶ 23–24.  Mr. Neuberger testified that Lehcim's tax returns were corporate records.  ECF No. 149 at 84:12–16.  Mr. Tendler testified that with respect to taxes owed, Michel Konig "would send us money" and NQGRG would do "whatever Mr. Konig told us to do."  ECF No. 148 at 165:8–10.  Any funds wired by Mr. Konig for payment of taxes would be placed in NQGRG's escrow account and any taxes paid would be drawn from the firm's escrow account.  *Id.* at 165:16–20, 166:2–9.

4.    Konig-Entity Loans

Many of the Konig family entities lent, borrowed, and distributed money to and from one another. ECF No. 127-1 ¶ 34; ECF No. 148 at 143:7–16. NQGRG would log these transactions in the client-matter trust ledger. ECF No. 127-1 ¶ 35. For example, in 2008, Ramat borrowed $75,000 from Wil-Coser Associates. JX-012 at 0037. Also in 2008, Acan West 52, Inc. borrowed $250,000 from Gazelle Larts, LLC. *Id*. at 0042. Many of the promissory notes documenting these transactions include handwritten notes as to the reason for the loan, such as "for share of $90K FC Development capital call," "[t]o pay 2006 taxes per IRS Notice," and "for Aim Equity Management quarterly fee." *Id.* at 0056, 0061, 0068.

Mr. Tendler testified that it is "a standard practice in many family businesses that an entity which has money and entities who don't have money, some cash rich, some cash poor, and they lend money back and forth." ECF No. 148 at 144:2–4. If Mr. Tendler was working on the Konig-related entity transfer of funds, he "would usually be the one to give the instructions." *Id.* at 144:8–9. Every time Mr. Tendler gave instructions to transfer funds or make a promissory note to reflect inter-entity loans, he had authorization from Mr. Konig or Mr. Konig's family. *Id*. at 144:10–13, 144:20–145:5. Sometimes the family representative did not know which entity had money and which entity did not, so Mr. Konig (or another relative) would say "I need money over here, get it there somehow." *Id.* at 145:6–9. These instructions, which would only be documented in an email, would come from Mr. Konig or a member of the Konig family. *Id.* at 145:10–14, 146:2–5. The transfers among Konig-related entities "were designed for the convenience of the family, all of their business operations." *Id.* at 146:16–17. Mr. Tendler billed a lot of his time to "keeping track of Mr. Konig's various entities and moving money from one to the other and keeping track of whose money it is," something he described as "[v]ery tedious work" because it had to be done "very carefully." *Id.* at 104:5–9; *see also* JX-032.

13

Mr. Tendler would communicate "the transactions that took place" and Leshkowitz & Co. "would categorize them." ECF No. 148 at 164:16–17.  Sometimes Leshkowitz & Co. would decide that a transfer of funds should be treated as something different, such as a repayment. *Id*. at 146:25–148:2.  Mr. Tendler explained, "I sent all the ledgers . . . to Mr. Leshkowitz with a promissory note, et cetera . . . .  He would or an accountant in his firm would say, that wasn't a loan, that was this company already owed money the other direction, so that's really a repayment, not a loan." *Id.* at 147:22–148:2.  Mr. Leshkowitz did not ever treat a promissory note as something other than a loan.  ECF No. 150 at 50:22–24.  But on two occasions, a promissory note was treated as a payment because Leshkowitz & Co. was told that the amounts receivable should be applied against a loan payable.  *Id.* at 51:8–17, 51:23–52:1, 52:5–12; JX-009; JX-010; DX-058 at 1221.  Mr. Leshkowitz explained that "[i]t was money going the other way and we offset it as a way of mitigating the interest."  ECF No. 150 at 52:11–12.

5.    Decision-Making

Mr. Konig made the decisions with respect to Lehcim.  ECF No. 148 at 161:20–21.[10] Sometimes authorization was given via a telephone call or email.  ECF No. 149 at 55:25–56:1, 121:16, 122:4–15.  Sometimes Mr. Neuberger traveled overseas to meet with Mr. Konig.  *Id.* at 120:24–25.  Mr. Neuberger testified that Michel Konig "negotiated transactions" and NQGRG "implemented them."  *Id.* at 120:25–121:1.  According to Mr. Neuberger, NQGRG did not "control Lehcim's actions;" Mr. Konig did.  *Id.* at 122:16–19; *see also id.* at 163:11–164:3.

---

[10] *See also* ECF No. 149 at 120:15–20 (Mr. Neuberger testifying that Mr. Konig made any significant decision on behalf of Lehcim, such as whether to make an investment, sell an investment, and how or when such transactions should be made.); *id.* at 89:1–2 ("I'm certain that I discussed all of this with Mr. Konig and that I had authority to sign."); Plaintiff Exhibit (PX)-017 at 0575 (email chain from Konig family member to Mr. Neuberger to Hillel Tendler to NQGRG staff directing the transfer of $250,000 from a Konig-family entity to Lehcim as a partial distribution); PX-020 at 0589 (same with respect to a $1 million transfer); ECF No. 148 at 175:17–18 (identifying the sender of the email as Mr. Konig).

Mr. Leshkowitz also testified that he and his staff "had meetings over the years with Mr. Konig and . . . one of his two sons that are active now in the business, . . . particularly when the IRS audits were very active." ECF No. 150 at 39:15–21; *see also id.* at 70:9–11. Mr. Neuberger, Mr. Tendler, and Mr. Leshkowitz each testified that the plan to repay all of the loans among the Konig-related entities was authorized by Mr. Konig. *See* II.E., *infra*.

D.      **The Internal Revenue Service (IRS) Examination**

In 2014, the IRS began examining (or auditing) Lehcim's 2010 through 2015 income tax returns, which continued for five years. ECF No. 127-1 ¶¶ 37–38; ECF No. 147 at 34:23–25, 50:21–22. This was one in a series of examinations involving Konig-related entities. ECF No. 150 at 72:16–23. Leshkowitz & Co. initially represented the entities, but later, outside counsel took over and became "the quarterback" of all of the audits. *Id.* at 73:1–5. On its balance sheet of its Form 1120 for tax years 2010 through 2020, Lehcim reported liabilities to Nightingale, which consisted primarily of the $850,000 Nightingale loan. ECF No. 127-1 ¶ 41. Mr. Leshkowitz explained that the issue for the IRS was "whether the loans that were on the books to foreign entities were independent bona fide loans or really represented capital contributions by the family." ECF No. 150 at 74:2–5. During the examination, Barabara Strazzeri, who previously worked as a Senior Revenue Agent with the IRS, concluded that the Nightingale loan liabilities Lehcim had listed on its tax returns would be disallowed. ECF No. 147 at 90:18–91:7. Ms. Strazzeri testified that she concluded that the $850,000 Nightingale loan was not bona fide because the parties to the loans were related, Lehcim did not adhere to the repayment schedules in the "initial formation documents," and "no funds were ever repaid." *Id.* at 91:14, 22–82:8.

Ms. Strazzeri requested copies of Lehcim's books and records during the examination. *Id.* at 80:25–81:2. She received a client-matter trust ledger, copies of promissory notes,

schedules, a listing of assets and liabilities, and other documents from the accountant. *Id.* at 81:4–17. Ms. Strazzeri requested, but did not receive, minutes of Lehcim's annual meetings and corporate minutes related to the L Gen partnership. *Id.* at 58:14–19, 70:9–13. Ms. Strazzeri understood that "the Konig family had money on account with [NQGRG]. It was put into the . . . client-matter trust ledger." *Id.* at 82:15–17. Ms. Strazzeri further testified that while the "majority of corporations" compensate their officers and directors, Lehcim's bylaws provided that there would "not be any stated salary" for its officers and directors. *Id.* at 59:3–5. Pamela Harris, a former IRS employee who coordinated the Lehcim and related examinations, testified that the IRS first received an unsigned partnership agreement for Ramat and then later received a signed agreement.[11] *Id.* at 125:15–18, 130:5–13. Ms. Harris did not see any communications with Mr. Konig, documents signed by Mr. Konig, or other evidence that Mr. Neuberger and Mr. Tendler received direction from Mr. Konig when making major decisions on behalf of Lehcim. *Id.* at 155:2–6, 165:8–18.

In June 2018, Ms. Strazzeri sent Lehcim's outside counsel a copy of her proposed adjustments for Lehcim's 2010 to 2015 tax returns, which treated the Nightingale loans as capital contributions. ECF No. 127-1 ¶ 42; ECF No. 147 at 90:7–17; JX-035; JX-036. On its 2018 income tax return, Lehcim stopped reporting the accrued interest on the $850,000 Nightingale loan. ECF No. 127-1 ¶ 50. Mr. Leshkowitz explained that "we decided not to continue to accrue interest" because one of the issues in the IRS examination "was whether or not the loans were going to be recognized by IRS as bona fide loans or were they capital." ECF No. 150 at 66:5–10.

---

[11] During her 39-year tenure with the IRS, Pamela Harris held the positions of Lead Revenue Agent, Fraud Enforcement Advisor, and Revenue Agent. ECF No. 147 at 123:24–25, 124:6–7, 124:12–14, 124:20–22. The record does not reflect when she held these positions or what her position was during the Lehcim examination.

16

On March 14, 2019, the IRS mailed a "30-day letter" that described the proposed changes to Lehcim's income tax returns. ECF No. 127-1 ¶ 44; ECF No. 147 at 97:1–3; JX-040. This letter "tells the taxpayer . . . what to do if they agree with the proposed changes in the report or . . . their next course of action, and they have 30 days to respond." ECF No. 147 at 97:5–12; JX-040. Lehcim did not appeal or agree to the proposed changes or pay the proposed tax. ECF No. 127-1 ¶ 48.

On November 20, 2019, the IRS mailed a Statutory Notice of Deficiency to Lehcim, which indicated that Lehcim owed $1,435,245 in unpaid taxes and penalties (exclusive of interest). ECF No. 127-1 ¶ 51; ECF No. 147 at 98:2–7; JX-051. Lehcim did not agree with or challenge the proposed tax assessments in the United States Tax Court. ECF No. 127-1 ¶ 54; ECF No. 147 at 132:21–24. The IRS assessed the deficiencies on July 13, 2020. ECF No. 127-1 ¶ 55.

### E.    The Repayment Plan

Mr. Neuberger, Mr. Tendler, and Mr. Leshkowitz planned to collect all of Lehcim's receivables from various related companies, obtain a $2.6 million contribution from Beauville, and use those funds to repay the Nightingale loans. *Id.* at ¶ 56. Mr. Leshkowitz testified that he "recommended that on a global basis for all the companies related to the Konig family we should shrink the intercompany balances." ECF No. 150 at 74:14–16. Mr. Leshkowitz explained that he recommends this for all of his clients because intercompany balances "just clog[ ] up the balance sheet so that when a bank looks at it or a buyer looks at it or a client looks at it, everything becomes muddled and confused." *Id.* at 74:21–24. According to Mr. Tendler, the genesis of the repayment plan was the IRS's position "that the various intercompany loans are not real . . . , and one of the reasons is because they were never repaid. So[,] the decision was made to, okay, we'll repay those loans and that would be -- that will show an indication that they

17

were real loans." ECF No. 148 at 148:15–22. Mr. Neuberger testified similarly, stating that "the best way to prove that they were loans was to pay them back." ECF No. 149 at 128:2–3. Mr. Konig decided to undertake the repayment plan, with the recommendation of his accountants and lawyers, and he was kept abreast of its progress. ECF No. 148 at 172:1–173:13; ECF No. 149 at 128:9–11; JX-038; JX-042; JX-046 at 0692; JX-048; JX-050 at 0702. Mr. Leshkowitz "spoke to Michel Konig [ ] about it" himself. ECF No. 150 at 75:7–9.

The repayment plan consisted of 10 "rounds" and 124 "steps" or individual bookkeeping entries reflecting transfers of money among various entities on various loans. ECF No. 127-1 ¶ 57; JX-046; JX-048; JX-052; JX-053; JX-056. The funds received from external sources were either wired into the NQGRG trust account and logged in Lehcim's client-matter trust ledger or booked as a debit on the transferring entity's client-matter trust ledger and a corresponding credit on Lehcim's client-matter trust ledger. ECF No. 127-1 ¶ 60. Mr. Neuberger also arranged for Beauville to wire $2.6 million dollars to Lehcim. *Id.* at ¶ 61. Lehcim used the transferred funds to repay the Nightingale loans. *Id.* at ¶¶ 62–63. The aggregate amounts of funds Lehcim transferred to Nightingale as part of the repayment plan are outlined below.

| Date | Amount |
| --- | --- |
| June 25, 2019 | $1,804,769 |
| September 3, 2019 | $1,774,280 |
| October 30, 2019 | $2,610,484 |
| December 3, 2019 | $123,915 |
| January 7, 2020 | $967,116 |
| January 21, 2020 | $784,052 |
| March 5, 2020 | $752,197 |
| **Total** | **$8,816,813** |

18

*Id.* at ¶ 64.[12]  The last entry on NQGRG's client-matter trust ledger for Lehcim is dated December 31, 2021, and reflects a zero balance.  JX-013 at 0090; *see also* ECF No. 148 at 111:17–112:7.

### F.        The IRS's Attempts at Collection

On November 30, 2020, the IRS sent Lehcim and its outside counsel a notice of intent to levy.  JX-023.  A notice of intent to levy advises that if the taxpayer does not make full payment of the unpaid tax liability, the IRS may take enforcement action and levy or seize funds.  ECF No. 147 at 184:24–185:4.  Following issuance of this notice, the IRS must wait 45 days before issuing a levy.  *Id.* at 185:12–16.  Upon receipt of a levy, the financial institution must wait 21 days before taking any action, during which time the levied funds are typically frozen in the account.  ECF No. 148 at 46:18–21, 78:18–22; JX-026 at 0301.  After the 21-day period expires, the financial institution must remit the levied funds to the IRS unless directed otherwise by the IRS.  ECF No. 148 at 46:22–25.

On December 2, 2020, Lehcim provided a Form 433-B (Collection Information Statement for Businesses) to the IRS.  ECF No. 127-1 ¶ 66; ECF No. 147 at 187:5, 14–16; JX-066.  On this form, the IRS asks a taxpayer to provide information about their assets, income, and expenses.  ECF No. 147 at 188:22–25.  Lehcim's Form 433-B reflected that it had no business bank accounts, cash on hand, or other physical assets.  JX-066 at 0914.  It further indicated that Acan Associates, The Larts Trust, and Wil-Coser Associates owed Lehcim a total of $967,457.  ECF Nos. 127-1 ¶ 66; JX-066 at 0915.  IRS Revenue Officer Erin Kennedy

---

[12]  Mr. Neuberger did not inform the IRS of the repayment plan because he was not in communication with the IRS.  ECF No. 149 at 107:13–15, 108:4–10.  Lehcim had outside counsel who communicated with the IRS with respect to Lehcim's examination.  *Id.* at 100:16.  Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. (NQGRG) recorded the repayment plan transfers on Lehcim's client matter trust ledger.  ECF No. 148 at 151:9–11, 152:3–9, 152:23–153:1; 154:15–19, 155:4–7, 155:14–17, 157:1–2, 186:8–14.  Joseph Leshkowitz produced the repayment plan records to the IRS.  ECF No. 150 at 75:21–23.

testified that she used this information to identify sources of collection for Lehcim's unpaid taxes.[13]  ECF No. 147 at 189:20–25.

On January 19, 2021, after the 45-day period had expired, Ms. Kennedy issued a notice of levy to PNC Bank.  JX-022 at 0191.  On January 28, 2021, Ms. Kennedy called PNC Bank and was advised that there were no accounts found for Lehcim.  ECF No. 147 at 192:8–10; JX-022 at 0194–0195.  Ms. Kennedy spoke with Lehcim's outside counsel, who advised that

---

[13]  IRS Revenue Officer Erin Kennedy was not a particularly credible witness. Throughout her testimony she had to refer to her ICS History (JX-022)—"a software application . . . used by Revenue Officers . . . [to] record . . . their interactions with taxpayers and collection activities" (ECF No. 147 at 11–15)—before answering nearly any question.  *E.g.*, ECF No. 147 at 184:10 ("I'd have to refer to my ICS history."), 185:21 ("Can I refer to my ICS history?"), 187:6 ("Could you refer to the ICS history, please?").  Indeed, Ms. Kennedy testified that she could not provide any information about her collection efforts if it was not documented in her ICS History.  ECF No. 148 at 45:1–4 ("Q.  I'm asking if you can attest or confirm any actions or communications taken with respect to Lehcim if it's not documented in your ICS history. A.  No."), 53:2–5 ("THE COURT:  Do you have any memory of why you called on that date in August?  THE WITNESS:  Other than what's in my ICS history, I can only attest to what's here.").

Ms. Kennedy's inability to testify independently is reflected in the below exchange in which it was evident that despite her 20 years of experience with the IRS (ECF No. 147 at 180:7–8) she could not answer fundamental questions without a prompt from her ICS History or other reference material:

Q.  How long does a [Collection Appeal Request] in your experience typically take?

A.  I don't have the Internal Revenue Manual in front of me, but I know I documented it in my [ICS] history.  Can I refer to it, please?

Q.  Is it five days, a month, if you can remember?

A.  I know it's in my --

THE COURT:  It's a general question.  As a general matter, how long does it take for a [Collection Appeal Request] to resolve?

THE WITNESS:  I mean, this is from the Internal Revenue Manual.  I don't know.

THE COURT:  Okay.  She doesn't know the answer.

ECF No. 148 at 31:20–32:6.

Lehcim had funds in NQGRG's trust account at PNC Bank.  ECF No. 147 at 193:8–13.  Ms. Kennedy learned from Ms. Harris that "Lehcim was using [NQGRG's] escrow account to conduct all of its transactions."  *Id.* at 194:18–25.  Ms. Kennedy also determined that a check that had been used to pay Lehcim's 2011 taxes was drawn on NQGRG's trust account.  *Id.* at 196:10–13; JX-067.

In March 2021, the IRS issued a notice of levy as to funds NQGRG held on behalf of Lehcim in its client trust fund.  ECF No. 127-1 ¶ 67; ECF No. 147 at 190:20–24; JX-026 at 0311–0312.  On March 19, 2021, the IRS received a response signed by Mr. Neuberger that indicated that Lehcim had no funds and no account.  JX-026 at 0312.  Ms. Kennedy spoke with Mr. Tendler who "stated that no money ha[d] been held in the firm's escrow account for Lehcim . . . in over a year."  ECF No. 148 at 8:22–24.  In June 2021, Ms. Kennedy began working on the special condition levy at issue in this case.  *Id.* at 16:4–9.  A special condition levy, such as a nominee or alter-ego levy, requires approval from IRS counsel.  *Id.* at 16:25–17:1.  The approval process requires the revenue officer to prepare a memorandum, which is reviewed by the group manager, followed by collection advisory, and ultimately IRS counsel.  *Id.* at 17:16–19.  Ms. Kennedy prepared a memorandum that sought authorization for a nominee levy.  *Id.* at 60:7–9.

While the special condition levy was being reviewed, Ms. Kennedy sent additional notices of levy.  *Id.* at 20:9–10.  In January 2022, the IRS sent notices of levy as to Lehcim's accounts receivable from Wil-Coser Associates and Acan Associates.  ECF No. 127-1 ¶¶ 68–69; ECF No. 148 at 20:20–21; JX-026 at 0309–0310.  The IRS did not receive a response or any funds from either notice.  ECF No. 127-1 ¶¶ 67–69; ECF No. 148 at 21:17–18, 22:9–14.

On May 12, 2022, the IRS issued a notice of levy to PNC Bank as to $1,543,929.29 held in NQGRG's operating account.[14]   ECF No. 127-1 ¶ 70; JX-026 at 0301.  This alter-ego levy differed from the earlier levy Ms. Kennedy had issued to PNC Bank seeking funds that NQGRG was holding on Lehcim's behalf because it would have attached to funds being held in NQGRG's name.  ECF No. 148 at 25:1–5.  As a result of this levy, "$1,543,929.29 was frozen by the IRS in [NQGRG's] operating account."  ECF No. 149 at 164:9–12.  These funds have not been returned to NQGRG.  *Id.* at 164:13–14.

On May 26, 2022, Lehcim filed a Collection Appeal Request, which was within the 21-day period that the financial institution must hold the levied funds before remitting them to the IRS.  ECF No. 148 at 27:2–3, 79:18–80:2; JX-027.  On May 27, 2022, Ms. Kennedy telephoned PNC Bank and was advised that the levy had attached to funds NQGRG's operating account for the full amount of the levy ($1,543,929.29).  ECF No. 148 at 48:8–12; JX-022 at 0246.  The PNC Bank representative told Ms. Kennedy that the bank was scheduled to turn the levied funds over to the IRS on June 3, 2022, following expiration of the 21-day holding period.  JX-022 at 0246.  Due to Lehcim's pending administrative appeal, Ms. Kennedy "instructed the representative of the bank to hold the funds and not remit them to the [IRS] at this time until further directed."  ECF No. 148 at 48:20–23; JX-022 at 0246.

On June 2, 2022, NQGRG also filed a Collection Appeal Request.  ECF No. 127-1 ¶ 72; ECF No. 148 at 28:11–15; JX-028.  NQGRG indicated in its appeal that "the levy issued to NQGRG's operating account should be immediately released.  As NQGRG asserts that the levy is erroneous, any funds attached by the levy should not be sent to the [IRS] until the instant appeal is adjudicated."  ECF No. 127-1 ¶ 74; JX-028 at 0320.  NQGRG did not "ask the IRS to

---

[14]  Ms. Kennedy did not include the 2011 tax period in the levy because there had been an additional assessment for the year, which required that the IRS issue a new final notice of intent to levy and wait 45 days.  ECF No. 148 at 24:10–23.

freeze the money in the PNC account until the conclusion of this litigation."  ECF No. 149 at 165:3–5.

Ms. Kennedy testified that she is not allowed to take "collection activity, enforcement action, levies, seizures, summons, suits," etc. once the IRS receives a Collection Appeal Request. ECF No. 148 at 28:1–5, 32:21–23, 53:14–15.  She did not testify as to the reason why.[15]  The appeals were denied as to NQGRG on July 6, 2022, and as to Lehcim on July 11, 2022, and the levy was sustained.[16]  ECF No. 127-1 ¶ 73; ECF No. 150 at 11:2–12:14; Plaintiff Exhibit (PX)-036; PX-037.  Ms. Kennedy testified that "if the determination [is] that the levy's sustained, we can take enforcement action."  ECF No. 150 at 20:20–21.  On August 3, 2022, Ms. Kennedy telephoned PNC Bank and "instructed [the bank representative] to have the Bank continue to hold the funds and not remit them to the [IRS] . . . until further directed."  JX-022 at 0258–0259. If Ms. Kennedy had not directed PNC Bank on May 27, 2022, and August 3, 2022, to hold the levied funds, the bank would have turned the funds over to the IRS.  ECF No. 148 at 54:17–23.

---

[15]  *See*, *e.g.*, ECF No. 148 at 28:2–7 (Q.  . . . When a [Collection Appeal Request] comes in, from a collection perspective, are you allowed to take further collection actions?  A.  No.  Q. And why is that?  A.  Collection is prohibited when a taxpayer files an appeal.").  The undersigned does not credit Ms. Kennedy's circular answer to this line of questioning.  Her inability to provide a substantive explanation or source of authority that forms the basis of the purported prohibition on collection activity is consistent with her general inability to testify independently.  *See* footnote 13, *supra*.  What is more, the United States did not introduce into evidence any policy supporting her position or argue that there is any applicable law that forecloses enforcement action during an administrative appeal.  It is therefore unclear that the pendency of a Collection Appeal Request has any bearing on the determination of when the IRS received the levied funds.

[16]  Ms. Kennedy initially testified that she learned that the Collection Appeal Request for NQGRG was closed on August 4, 2022, based on the information in her ICS History (JX-022). ECF No. 148 at 40:10–15.  She later testified that emails were sent to her on July 5 and 11, 2022, notifying her that the Collection Appeal Requests had been closed and the levy had been sustained.  ECF No. 150 at 8:3–5, 11:7–9, 12:9–11; PX-036; PX-037.

## III.   CONCLUSIONS OF LAW

NQGRG asserts a single cause of action pursuant to 26 U.S.C. § 7426, alleging that the United States' March 12, 2022 alter-ego levy on NQGRG's operating account was wrongful. The questions of the United States' liability and available relief are addressed in turn below.

### A.   Liability

Federal law authorizes the Secretary of the Treasury "to collect taxes 'by levy upon all [non-exempt] property and rights to property' belonging to a person who 'neglects or refuses to pay' any tax." *G.M. Leasing Corp.* v. *United States*, 429 U.S. 338, 349 (1977) (quoting 26 U.S.C. § 6331(a)). "This levy power extends to property held in the name of persons or entities other than the delinquent taxpayer, to the extent that the taxpayer has an interest in such property." *Scoville* v. *United States*, 250 F.3d 1198, 1201 (8th Cir. 2001) (citing *G.M. Leasing Corp.*, 429 U.S. at 350). When "a taxpayer's property is held by another, a notice of levy upon the custodian is customarily served pursuant to § 6332(a)," which "gives the IRS the right to all property levied upon." *United States* v. *National Bank of Com.*, 472 U.S. 713, 720 (1985).

This statutory scheme provides a mechanism for a third party to challenge a tax levy. Section 7426(a)(1)—which supplies the basis for NQGRG's sole cause of action—provides:

> If a levy has been made on property . . . , any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in . . . such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States.

26 U.S.C. § 7426(a)(1). "To prove that a levy is wrongful, (1) a plaintiff must first show some interest in the property to establish standing, (2) the burden then shifts to the [United States] to prove a nexus between the property and the taxpayer, and (3) the burden then shifts back to the plaintiff to prove the levy was wrongful, e.g., that the property in fact did not belong to the taxpayer." *Oxford Cap. Corp.* v. *United States*, 211 F.3d 280, 283 (5th Cir. 2000).

Here, based on the parties' agreement, the undersigned previously found that NQGRG has an interest in the levied funds, thus satisfying the first required element. *NQGRG I*, 2024 WL 3234000, at *5. As to the second required element, the United States may establish the requisite nexus between the levied property and the taxpayer through evidence that a third party holding the property is the taxpayer's alter ego. *Towe Antique Ford Found.* v. *Internal Revenue Serv.*, 999 F.2d 1387, 1390 (9th Cir. 1993) (collecting cases). If the United States carries its burden of establishing the required nexus, NQGRG must then establish that the levy was wrongful. A levy "is wrongful if imposed upon property in which the taxpayer had no interest . . . or if the levy . . . effectively destroys . . . a person's proprietary interest that is senior to the Federal tax lien." *Oxford Cap. Corp.*, 211 F.3d at 283; *see also Scoville*, 250 F.3d at 1201 ("A levy is wrongful when made on property in which the delinquent taxpayer actually has no interest.") (citing *Pate* v. *United States*, 949 F.2d 1059, 1060 (10th Cir. 1991)).

Given that the first element has been satisfied, the undersigned begins with the second element: nexus. The United States Supreme Court has outlined a two-step process that governs the nexus analysis. The Court must "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property.'" *Drye* v. *United States*, 528 U.S. 49, 58 (1999). State law determines only whether the taxpayer has an interest in or rights to the property at issue; it does not determine the federal tax consequences associated with the property or rights to property. *National Bank of Com.*, 472 U.S. at 722 ("'[O]nce it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative,' and the tax consequences thenceforth are dictated by federal law.") (alterations in original) (quoting *United States* v. *Bess*, 357 U.S. 51, 56-57 (1958)). "Put differently, state law 'determines only which sticks are in a

person's bundle,' but federal law determines whether 'those sticks qualify as "property" for purposes of the federal tax lien statute.'" *NQGRG I*, 2024 WL 3234000, at *5 (quoting *United States* v. *Craft*, 535 U.S. 274, 278-279 (2002)). In the end, "the [Internal Revenue] Code and interpretive case law place under federal, not state, control the ultimate issue whether a taxpayer has a beneficial interest in any property subject to levy for unpaid federal taxes." *Drye*, 528 U.S. at 57. Importantly, the "Supreme Court has consistently emphasized, both in the text and substance of its decisions, that the United States as tax collector stands on different footing than an ordinary creditor." *Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, Civil Action No. EA-22-2129, 2025 WL 659546, at *2 (D. Md. Feb. 28, 2025) (*NQGRG II*) (collecting cases); *see also NQGRG I*, 2024 WL 3234000, at *6 (collecting cases); *see also* footnote 21, *infra*.

Here, the United States seeks to establish the requisite nexus through evidence that NQGRG is the alter ego of Lehcim, the delinquent taxpayer. "Alter ego means 'other self'—where one person or entity acts like, or, for another to the extent that they may be considered identical." *United States* v. *Scherping*, 187 F.3d 796, 801 (8th Cir. 1999); *see also Prompt Staffing, Inc.* v. *United States*, 321 F. Supp. 3d 1157, 1170 (C.D. Cal. 2018) ("Alter ego focuses on whether the taxpayer's relationship to the title holder allows the taxpayer to retain the benefits of true ownership."). Although not yet addressed by the United States Court of Appeals for the Fourth Circuit, the clear majority of other United States Circuit Courts of Appeals have approved of the application of state law to determine whether a third party is a taxpayer's alter ego in the context of a tax levy. *Berkshire Bank* v. *Town of Ludlow, Mass.*, 708 F.3d 249, 251-252 (1st Cir. 2013); *Old W. Annuity & Life Ins. Co.* v. *Apollo Grp.*, 605 F.3d 856, 861 (11th Cir. 2010); *Scherping*, 187 F.3d at 802; *Floyd* v. *Internal Revenue Serv.*, 151 F.3d 1295, 1297 (10th Cir. 1998); *Zahra Spiritual Tr.* v. *United States*, 910 F.2d 240, 242 (5th Cir. 1990); *Wolfe* v. *United States*, 806 F.2d 1410, 1411 (9th Cir. 1986).

Alter ego is a theory of liability that appears in many different areas of Maryland law. *NQGRG I*, 2024 WL 3234000, at *7 (collecting cases). Here, both parties rely on Maryland alter-ego law in the context of piercing the corporate veil. ECF Nos. 152 at 12–13; 153 at 19–21. Under Maryland law, "a corporate entity may be disregarded when necessary to prevent fraud or to enforce a paramount equity." *Schlossberg* v. *Bell Builders Remodeling, Inc.*, 441 Md. 671, 672 (2015). In *Hildreth* v. *Tidewater Equipment Company*, the Supreme Court of Maryland synthesized veil-piercing case law and delineated the circumstances in which courts may disregard the corporate form.[17] 378 Md. 724 (2003). The *Hildreth* Court outlined that, in Maryland, the corporate entity will be disregarded in the following circumstances:

> *First.* Where the corporation is used *as a mere shield for the perpetration of a fraud,* the courts will disregard the fiction of separate corporate entity.
>
> *Second.* The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, *in order to prevent evasion of legal obligations.*
>
> *Third.* Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, *fail to observe the corporate entity, operating the business or dealing with the corporation's property as if it were their own,* the courts will also disregard the corporate entity for the protection of third persons.

*Id.* at 734 (emphasis in original).

The "third circumstance embodies what is sometimes called the 'alter[-]ego' doctrine," the rationale for which is that "if the shareholders or the corporations themselves disregard the proper formalities of a corporation, then the law will do likewise as necessary to protect individual and corporate creditors." *Id.* at 735 (quoting Alter ego or mere instrumentality

---

[17] Effective December 14, 2022, the name of Maryland's highest court was changed from the "Maryland Court of Appeals" to the "Supreme Court of Maryland." *Middleton* v. *Koushall*, Civil Action No. ELH-20-3536, 2024 WL 1967816, at *21 n.16 (D. Md. May 3, 2024). The undersigned uses the Court's present name in this Memorandum Opinion.

doctrine, 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.10 (1999 Rev. Vol.) (internal quotation marks omitted)).  *Hildreth* explains that the alter-ego doctrine is "subsumed . . . in the notion of paramount equity."  378 Md. at 739.  This "doctrine has been applied 'where the corporate entity has been used as a subterfuge and to observe [the entity's corporate status] would work an injustice.'"  *Holder* v. *Estes*, No. 61, Sept. Term, 2023, 2024 WL 1975249, at *17 n.32 (App. Ct. Md. May 3, 2024) (alteration in original) (quoting *Hildreth*, 378 Md. at 735).

To invoke the alter-ego theory of liability, a plaintiff must show a "complete domination" of the corporate entity that was used "to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act" that "proximately caused the injury or unjust loss" and involved fraud or would lead to "an inequitable result, involving fundamental unfairness."  *Hildreth*, 378 Md. at 735.  While there is "no universal rule as to the specific criteria that courts will consider in determining whether to apply the [alter-ego] doctrine," the *Hildreth* Court outlined a series of relevant factors, drawing on the Fletcher treatise and case law.  *Id.*  These factors include:

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.*  Case law is clear that, in the context of disregarding the corporate form, the alter-ego doctrine "is applied 'with great caution and reluctance' and only in 'exceptional circumstances.'"  *Id.* (quoting 1 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.10); *see also Residential Warranty Corp.* v. *Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 309 (1999) ("Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil.").

In sum, the Court must determine "whether the United States has presented sufficient evidence to establish that NQGRG and Lehcim . . . were alter egos, guided by the multi-factor analysis set forth in *Hildreth* and the understanding that Maryland permits veil piercing only in cases of fraud or paramount equity." *NQGRG II*, 2025 WL 659546, at *5. Analysis of the evidence reveals that the United States has not made the requisite showing. The picture the United States paints in its post-trial memorandum of law—particularly that set forth in the introduction's allegations of NQGRG's widespread self-dealing, deceit, orchestration of tax fraud, and unilateral decision-making to the detriment of its client—is entirely unsupported by the evidence of record in the instant action. ECF No. 152 at 7–9.

NQGRG and the United States disagree as to the quantum of evidence required to establish a nexus between the taxpayer and the levied property. NQGRG argues that "clear and convincing evidence" is required because the Court must apply Maryland law at the first step of the nexus analysis. ECF No. 153 at 18. The United States contends that "substantial evidence" applies based on the weight of authority from the United States Circuit Courts of Appeals. ECF No. 152 at 10–11. Substantial evidence is "considerably more than a preponderance but less than clear and convincing proof." *LiButti* v. *United States*, 107 F.3d 110, 118 (2d Cir. 1997) (internal quotation marks and citation omitted); *see also Oxford Cap. Corp.*, 211 F.3d at 283 (same). "Clear and convincing evidence is that which supports 'a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.'" *United States* v. *Welsh*, 564 Fed. Appx. 727, 728 (4th Cir. 2014) (quoting *United States* v. *Antone*, 742 F.3d 151, 159 (4th Cir. 2014)). It is unnecessary to resolve this question because the United States has not carried its burden under the lesser substantial evidence standard.[18]

---

[18] The parties also dispute whether Defendant United States of America was required to have probable cause to support the levy at the time of its issuance or whether the reviewing court

At the outset, NQGRG contends that it cannot be Lehcim's alter ego as a matter of law because the firm is not Lehcim's shareholder, parent, or owner (beneficial or otherwise).  ECF No. 153 at 21–22; *see also* ECF No. 70-1 at 33–35; ECF No. 75 at 10–11, 15–18.  The undersigned previously rejected this argument based on the lack of identifiable, controlling law establishing that Maryland alter-ego liability runs only to a shareholder, parent, or owner, and applying that principle in the context of the alter-ego nexus analysis in a wrongful levy action.[19]

---

must conduct a de novo review based on the entire record.  ECF No. 152 at 29–30; ECF No. 153 at 18, 24–26; *see also* ECF No. 67-1 at 30–32.  In advancing this probable cause argument, NQGRG relies upon an out-of-circuit decision, *Oxford Capital Corp. v. United States*, 211 F.3d 280, 283 (5th Cir. 2000).  As the undersigned observed previously, "[t]he *Oxford Cap. Corp.* concurrence does not have broad support in case law."  *Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, Civil Action No. EA-22-2129, 2025 WL 659546, at *7 (D. Md. Feb. 28, 2025) (*NQGRG II*); *see also Scoville* v. *United States*, 250 F.3d 1198, 1201 n.3 (8th Cir. 2001) (declining to decide that the government must prove that it had probable cause at the time of the levy); *Steven N.S. Cheung, Inc.* v. *United States*, No. C04-2050RSM, 2006 WL 2473487, at *5 (W.D. Wash. Aug. 28, 2006) (declining to adopt the standard set forth in the *Oxford Cap. Corp.* concurrence).

Other decisions have noted that the "government's burden of establishing a basis for its summary seizure will vary, depending on the type of relief sought and the timing of the judicial inquiry," *Valley Fin., Inc.* v. *United States*, 629 F.2d 162, 171 n.19 (D.C. Cir. 1980).  Thus, while a "showing of probable cause . . . can rebuff immediate challenges to the propriety of a levy . . . stronger support . . . is needed where . . . the basis for government action is explored in depth during discovery, and the trial court is rendering its final judgment." *Id.*; *see also Steven N.S. Cheung, Inc.*, 2006 WL 2473487, at *5 (deciding to "consider all of the evidence developed since defendant levied plaintiff's accounts, and which [wa]s properly before th[e] Court").

Thus, it is unclear what role, if any, an assessment of probable cause at the time of the levy plays during a trial on the merits of a wrongful levy claim.  Regardless, it is unnecessary to reach this issue because the United States has not carried its burden at the de novo stage of the case, thus rendering irrelevant the question of whether probable cause existed at the time of the levy.

[19]  Citing a recent decision of this Court, NQGRG comes closer to establishing the first point with respect to the availability of alter-ego liability under Maryland corporate veil-piercing law.  ECF No. 153 at 5–6; *Future Field Solutions, LLC* v. *Van Norstrand*, Civil Action No. DKC-23-1301, 2026 WL 183522, at *12 (D. Md. Jan. 23, 2026) (ruling that "traditional veil piercing, which is vertical in concept, [was] inapplicable" where two entities had an address, asset, and owners in common, but there was no ownership relationship).  Even so, as the undersigned observed previously, this is not a corporate veil-piercing case that calls for a

*NQGRG II*, 2025 WL 659546, at *4-5; *NQGRG I*, 2024 WL 3234000, at *9-10.  As the undersigned explained previously, the dividing line between the state-law and federal-law components of the two-step nexus analysis is unclear.  *NQGRG I*, 2024 WL 3234000, at *7 ("The lower courts have taken divergent approaches in their application of the two-step inquiry, leaving quite murky the question of where the state law analysis ends, and the federal law analysis begins.").[20]  This ambiguity, together with a series of cases in which "the Supreme Court has rejected the application of state law that shields property from ordinary creditors as determinative of the federal government's ability enforce tax levies and liens" complicates the application of Maryland veil-piercing law.[21]  *NQGRG II*, 2025 WL 659546, at *3 (discussing

---

straightforward application of Maryland law.  *NQGRG II*, 2025 WL 659546, at *2.  "This is a wrongful levy case that arises out of a tax liability that the United States sought to collect from the taxpayer's alleged alter ego.  Correct application of the law in the instant action requires appreciation of this important distinction."  *Id*.; *see also* footnote 21, *infra*.

[20]  For example, in *Prompt Staffing, Inc.* v. *United States*, the district court applied California law to determine whether the taxpayer was the alter ego of the plaintiff corporations and then applied federal law to determine that the IRS could permissibly employ reverse veil piercing to levy the corporations' funds. 321 F. Supp. 3d 1157, 1175-1179 (C.D. Cal. 2018).  On the other hand, the district court's analysis in *Old W. Annuity & Life Ins. Co.* v. *Apollo Grp.* rested entirely on state law, concluding that Florida's restrictive alter-ego law precluded the IRS from levying the corporate assets.  Civil Action No. 5:03-CV-354-OC-10GRJ, 2008 WL 2993958, at *7-10 (M.D. Fla. Aug. 1, 2008), *aff'd*, 605 F.3d 856 (11th Cir. 2010).  As of yet, there is no interpretive case law from the United States Court of Appeals for the Fourth Circuit that would provide guidance on the correct application of the two-step nexus analysis.

[21]  For example, in *United States* v. *Bess*, the United States Supreme Court held that the Court of Appeals had erred in deciding that the property at issue (the cash surrender value of an insurance policy) was not subject to a federal tax lien because under New Jersey law such property was protected against liens, whether by either a private creditor or state agency.  357 U.S. 51, 56-57 (1958).  Several decades later, the Court ruled in *United States* v. *National Bank of Commerce* that the Court of Appeals had "misconceive[d] the role properly played by state law in federal tax-collection matters" when it concluded that a federal tax levy was improper based on its "understanding of the Arkansas law of creditors' rights."  472 U.S. 713, 727 (1985).  Thus, "the fact[ ] that under Arkansas law [the taxpayer's] creditors . . . could not exercise [the taxpayer's] right of withdrawal in their favor . . . [was] irrelevant."  *Id.*  Fourteen years later, the Supreme Court reiterated the principle that state law that removes property from the reach of ordinary creditors does not invalidate an otherwise enforceable federal tax lien.  *Drye* v. *United*

cases).  Ultimately, this question does not need to be resolved because, as discussed below, the United States has not carried its burden of establishing that NQGRG is Lehcim's alter ego regardless of whether the first step of the nexus analysis requires consideration of NQGRG's ownership interest in the taxpayer entity.

Turning to application of the *Hildreth* factors, the undersigned first considers Lehcim's capitalization, observation of corporate formalities, issuance of stock and dividends, and profitability.  378 Md. at 735.  The record establishes that Lehcim was profitable and adequately capitalized.  Lehcim was incorporated to be a holding company that generated income through direct and indirect investments and it was successful in this undertaking.  *See* II.C.2, *supra*. Indeed, the IRS concluded that Lehcim had a substantial amount of taxable income and past-due taxes for the years under examination.  *See* II.D., *supra*.  The prevalence of inter-Konig-entity loans and the repayment plan itself reflect that Lehcim had access to the capital it needed for its investment activity and other operations.  *See* II.C.4., II.E., *supra*.  It is not clear that Lehcim issued dividends, although it did receive substantial dividends from its investment in L Gen and indirect investment in Genesis Healthcare.  *See* II.C.2. and footnote 9, *supra*.  Lehcim's articles of incorporation authorized the issuance of stock.  JX-001.

In terms of corporate formalities, Lehcim had officers and a director, who took direction from its beneficial owner.[22]  *See* II.C.1, C.5, *supra*.  Ms. Strazzeri testified that, in her

---

*States*, 528 U.S. 49, 53, 58-59 (1999).  On this basis, the Supreme Court affirmed the Circuit Court's holding "that the state law consequences of Drye's right to his mother's estate, namely, the legal fiction that is created through Drye's disclaimer under [Arkansas law] is of no concern to the operation of the federal tax law."  *Drye Fam. 1995 Tr.* v. *United States*, 152 F.3d 892, 898 (8th Cir. 1998), *aff'd sub nom.*, 528 U.S. 49.  Finally, in *United States* v. *Craft*, the Court concluded that a taxpayer's "interest in the entireties property constituted 'property' or 'rights to property' for the purposes of the federal tax lien statute" even though "Michigan makes a different choice with respect to state law creditors."  535 U.S. 274, 288 (2002).

experience, officers and directors were typically compensated separately, but Mr. Neuberger testified that it was not uncommon for him to serve as an officer and director for entities on behalf of clients and that he had done so for more than 1,100 entities on behalf of Mr. Konig and other clients. *See* II.C.1, II.D, *supra*. Because this was a service that NQGRG provided for many clients, it makes sense that NQGRG would bill for this at an hourly rate, as it did for the provision of legal services. *See* II.C.1, *supra*. Lehcim did not hold formal board or shareholder meetings as set forth in its bylaws, but Mr. Neuberger testified that this practice was not uncommon and there is no evidence to the contrary. *Id.* Further, as discussed previously and below, Lehcim's transactions were recorded in its books and records. *See* II.C.1, C.3, *supra*; III.A (fifth *Hildreth* factor), *infra*.

The most the United States can point to with respect to the first set of *Hildreth* factors is that some partnership agreements of related entities—not that of Lehcim itself—were not drafted and executed contemporaneously with their effective dates. *See* II.C.2, *supra*. The documentation of related partnership agreements is only marginally relevant to the question of Lehcim's observation of corporate formalities. What is more, Mr. Quinn credibly testified as to why the L Gen partnership agreement, for example, was not drafted and executed contemporaneously. *Id.* Mr. Quinn explained that the details of the partnership were agreed

---

[22] The United States contends that there is inadequate evidence that Mr. Konig made decisions on behalf of Lehcim. ECF No. 152 at 14. A review of the record reveals no evidence to the contrary, other than an assertion by Ms. Harris that during her coordination of the Lehcim and related-entity examinations she did not see evidence that Mr. Konig provided direction to Mr. Neuberger and Mr. Tendler. *See* II.D., *supra*. It is unclear what information and documentation Ms. Harris had access to when she made this assessment. Further, other witnesses who worked directly with and on behalf of Mr. Konig and Lehcim consistently testified to the contrary. Although the United States describes this testimony as "murky hearsay testimony of self-interested witnesses," the undersigned evaluates their credibility differently and accords more weight to their testimony, which is based on their personal knowledge and experience, than that of Ms. Harris, who did not have access to the same breadth of information given that her sole engagement with Lehcim was the IRS examination.

upon, documented informally, and understood, but had simply not yet been committed to a formal written partnership agreement. *Id.* The United States offered no evidence to rebut this testimony or to establish that the partnership agreements of the related entities were not, in fact, legitimate. Even if it had, the legitimacy of the partnership agreements of other entities do not meaningfully shed light on the relationship between Lehcim and NQGRG.

The United States also points to the fact that in 2006, Mr. Neuberger, in his individual capacity, attempted to become a partner in an entity related to Lehcim while also serving as an officer and director of Lehcim. *Id.* This, too, has marginal relevance to consideration of the relationship between NQGRG and Lehcim in 2022, more than a decade and a half later. On balance, the first set of *Hildreth* factors weighs against finding an alter-ego relationship.

The second factor (comingling of corporate and personal assets) and third factor (functionality of officers/directors) also run counter to a finding of alter ego. There is no evidence that NQGRG and Lehcim comingled assets. In fact, the only testimony on this point was entirely to the contrary. NQGRG maintained an operating account which it used to fund the law firm's operations and a separate IOLTA account where it held client funds in trust. *See* II.A., *supra*. NQGRG did not have any ownership or financial interest in Lehcim and received none of Lehcim's profits. *Id.* Even when Mr. Konig's legal bills were past due, NQGRG did not draw from Lehcim's or Mr. Konig's ledgers in NQGRG's IOLTA account; it simply waited for the client to authorize payment. *Id.* The United States also points to the fact that NQGRG did not have its own bank account and that NQGRG did not maintain a client-matter trust ledger for Lehcim until 2010, which was after Lehcim had invested in One Penn Center. ECF No. 152 at 16. Yet, Ms. Strazzeri testified that the money Lehcim earned from this investment *was* documented on an NQGRG client-matter trust ledger. ECF No. 147 at 111:22–112:2. Further, the unrebutted testimony of NQGRG principals establish that a large number of clients have

money in NQGRG's IOLTA account, which NQGRG tracks in client-matter trust ledgers consistent with Maryland law. *See* II.A., *supra*. The record does not reveal why Lehcim's client-matter trust ledger was not opened until 2010, but testimonial and documentary evidence reflect that Lehcim's transactions, investments, and promissory notes were recorded. *See* II.C.2–C.4, II.E, *supra*.

There is minimal evidence in the record to evaluate the fourth factor (solvency). The United States attempts to argue that the Court's previous finding with respect to Lehcim's solvency in a related case conclusively establishes its insolvency here. ECF No. 152 at 17–18; *United States* v. *Neuberger*, 807 F. Supp. 3d 495, 514 (D. Md. 2025). This argument is unavailing. First and foremost, the United States did not raise this issue until the filing of its post-trial memorandum of law—a simultaneous filing that NQGRG had no opportunity to oppose. The United States' assertion that entry of final judgment in the related case was a prerequisite to its assertion of issue preclusion here (ECF No. 152 at 17 n.1) does not excuse its failure to alert opposing counsel and the Court to this issue in the pretrial filings or proceedings, or even during or at the conclusion of trial.[23]

---

[23] Also in the category of what one might consider an attempt at unfair advantage, the United States did not adhere to the required number and length of post-trial submissions. After the close of evidence, the parties agreed to file consolidated findings of fact and conclusions of law.

> THE COURT: So[,] I would suggest that we have a single post-trial filing by each side. Any objection?
>
> [Plaintiff's Counsel]: No objection. I think that's the way to go.
>
> [Defense Counsel]: Same here, Your Honor.

ECF No. 150 at 84:7–11. Yet, the United States filed separate proposed findings of fact and conclusions of law, one of which was 39 pages in length notwithstanding this Court's 30-page limit on trial briefs. ECF Nos. 151–152; Local Rule 105.3 (D. Md. Dec. 1, 2025). As a result, the United States' post-trial filings are more than double the number of pages filed by NQGRG.

Courts in this Circuit and elsewhere have concluded that an argument raised for the first time in post-trial briefing following a bench trial is improper.  *E.g.*, *McDonald on behalf of Lab'y Corp. of Am. Holdings Employees' Ret. Plan* v. *Laboratory Corp. of Am. Holdings*, No. 1:22CV680, 2025 WL 2325016, at *23 (M.D.N.C. Aug. 12, 2025) (declining to consider new arguments advanced in post-trial proposed findings of fact and conclusions of law, which "certainly constitutes unfair surprise and prejudice" to the opposing party); *cf. Halig* v. *National Bd. of Examiners in Optometry, Inc.*, Civil Action No. BAH-22-2118, 2026 WL 821837, at *12 (D. Md. Mar. 25, 2026) (observing that "proposed conclusions of law are not normally the forum in which to present novel legal arguments resulting from a change in controlling law").[24]

Setting aside concerns about timeliness, fairness, and waiver, the United States' issue preclusion argument fails most fundamentally because the parties in this and the related case are not the same.  The issue preclusion "doctrine instructs that 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action *involving a party to the prior litigation*."  *In re: Gardasil Prods. Liab. Litig.*, 151 F.4th 178, 196 (4th Cir. 2025) (emphasis added), *cert. denied sub nom.*, 2026 WL 858412 (March 30, 2026) (quoting *Montana* v. *United States*, 440 U.S. 147, 153 (1979)); *see also Orca Yachts, L.L.C.* v. *Mollicam, Inc.*, 287 F.3d 316, 318 (4th Cir. 2002) (explaining that "issue preclusion is more narrowly drawn [than claim preclusion] and applies when the later litigation arises from a different cause of action *between the same parties*") (emphasis added).  NQGRG, the party the United States seeks to preclude from

---

[24]  *See also Global Digital Sols., Inc.* v. *Grupo Rontan Electro Metalurgica, S.A.*, Civ. No. 1880106, 2021 WL 921053, at *4 n.1 (S.D. Fla. Feb. 3, 2021) ("Defendants . . . cannot now, for the first time in their proposed findings of fact and conclusions of law, put forward new substantive legal arguments."); *Aguilar* v. *Arthritis Osteoporosis Ctr.*, No. CIVA M-03-243, 2006 WL 2478476, at *5 n.8 (S.D. Tex. Aug. 25, 2006) ("Arguments raised for the first time in post-trial briefing are waived.").

litigating the issue of Lehcim's solvency, was not a party to the United States' lawsuit against

Mr. Neuberger.  Nevertheless, the United States contends that NQGRG "is in privity with Mr.

Neuberger" and thus is considered to be the same party.  ECF No. 152 at 18.  As the Fourth

Circuit has explained, privity is "a relationship relevant to claim preclusion, and irrelevant to

issue preclusion."  *Saudi* v. *V. Ship Switzerland, S.A.*, 93 Fed. Appx. 516, 519 (4th Cir. 2004).

As to issue preclusion, the relevant relationship-based inquiry is whether "the party to be

foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the

issue or fact in the prior proceeding."  *In re: Gardasil Prods. Liab. Litig.*, 151 F.4th at 196.

Here, NQGRG—a professional association with approximately 20 principals, only one of

whom is Mr. Neuberger, *see* II.A., *supra*—did *not* have "a full and fair opportunity to litigate the

issue" of Lehcim's solvency in the related case, which is fatal to the United States' issue-

preclusion argument.  Moreover, even if NQGRG and Mr. Neuberger could be considered in

privity, the undersigned would exercise the trial court's "broad discretion" and disallow issue

preclusion because reliance on an issue litigated by Mr. Neuberger in the related case without

notice or a meaningful opportunity to object would be unfair to NQGRG.  *Parklane Hosiery Co.*

v. *Shore*, 439 U.S. 322, 331 (1979); *see also Fate* v. *Dixon*, 649 F. Supp. 551, 558 (E.D.N.C.

1986) (observing that "application of [offensive issue preclusion] under the circumstances must

not do injustice to the party").  Because there is no evidence of record regarding Lehcim's

solvency, other than the fact that it maintained a zero balance in the NQGRG client-matter trust

ledger following the repayment plan, this factor counsels against a finding of alter ego.

Finally, the fifth factor (corporate records) also runs counter to finding an alter-ego

nexus.  The uncontested evidence is that Lehcim maintained a variety of corporate records,

including articles of incorporation, bylaws, corporate minutes, promissory notes, ledgers, balance

sheets, and tax returns.  *See* II.C.3, *supra*.  Many of the promissory notes were annotated with

37

handwritten notes further documenting the purpose of the note.  *See* II.C.4, *supra*.  Mr. Tendler

credibly testified that he carefully documented all of the inter-Konig-entity loans, which was

"tedious" work that had to be done "very carefully."  ECF No. 148 at 104:5–9.  The mere fact

that Lehcim did not maintain an independent bank account is insufficient to overcome the other

evidence reflecting that its structure, finances, investments, and loans were documented.

None of the *Hildreth* factors point to an alter-ego relationship between NQGRG and

Lehcim, a corporation—like many others—that NQGRG had formed on behalf of a client.  The

evidence does not remotely support a finding that NQGRG exercised "complete domination" of

Lehcim such that Lehcim had "no separate mind, will[,] or existence of its own."  *Hildreth*, 378

Md. at 734-735.  What is more, Maryland alter-ego law, in the context of piercing the corporate

veil, also requires a finding that disregarding the corporate entity is "necessary to prevent fraud

or to enforce a paramount equity."  *Schlossberg*, 441 Md. at 672.

As to the first circumstance, the United States did not introduce evidence that NQGRG

operated Lehcim to perpetrate a fraud.  The United States contends that NQGRG hid Lehcim's

income by documenting transfers exclusively on the firm's client-matter trust ledgers, actively

deceived the IRS during Lehcim's examination, and then liquidated Lehcim's assets through a

series of fraudulent transfers.  ECF No. 152 at 20–26.  There is, however, no evidence in the

record of the case at bar to support these assertions.  The three IRS-affiliated witnesses (Ms.

Strazzeri, Ms. Harris, and Ms. Kennedy) testified as to the Lehcim examination and the IRS's

attempts at collection.  With respect to fraud, these witnesses offered at most a passing

observation as to how certain aspects of Lehcim's operations or recordkeeping differed from that

of other corporations.  The remaining witnesses (Mr. Tendler, Mr. Neuberger, Mr. Quinn, Mr.

Thomas, and Mr. Leshkowitz) testified as to NQGRG's and Lehcim's operations.  These

witnesses consistently and cogently stated that Lehcim's investment activity, officers and

director, recordkeeping, etc. mirrored that of many other entities NQGRG attorneys formed on behalf of Mr. Konig and other clients. This testimony—including the rationale for the repayment plan—was largely unchallenged. There is simply no support for the allegations of fraud the United States advances in its post-trial briefing.

As to the second circumstance, "no court in Maryland has apparently ever pierced the corporate veil to enforce a paramount equity." *Sirona Dental Sys., LLC* v. *Stevenson Grp., Inc.*, Civil Action No. CCB-12-1253, 2013 WL 3875325, at *4 (D. Md. July 25, 2013); *see also Residential Warranty Corp.*, 126 Md. App. at 307 ("Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil 'for reasons other than fraud' have failed in Maryland courts."); *Travel Comm., Inc.* v. *Pan Am. World Airways, Inc.*, 91 Md. App. 123, 158 (1992) ("Notwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the [Maryland Supreme] Court . . . to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware."). Consistent with these authorities, Maryland courts have refused to find a paramount equity in cases involving self-dealing, comingling of assets, and bad faith, none of which is present here. *E.g.*, *Hildreth*, 378 Md. at 733-734 (no finding of paramount equity where the sole shareholder was personally involved in transactions, exercised bad faith, engaged in business transactions with an unregistered corporation, and where there was suggestion of a conscious evasion of responsibilities); *Bart Arconti & Sons, Inc.* v. *Ames-Ennis, Inc.*, 275 Md. 295, 313 (1975) (use of the same place of business, comingling of assets, self-dealing, rendering the corporation insolvent, all with the purpose of evading legal obligations, were insufficient to establish paramount equity). In sum, the United States has not carried its burden of establishing the alter-ego nexus and its May 12, 2022 levy is therefore wrongful.

**B.      Relief**

NQGRG seeks an order requiring the United States to return the wrongfully levied property, or alternatively, judgment in its favor in the amount of the money levied upon, as well as an award of interest.  ECF No. 1 at 19; ECF No. 153 at 8, 26–32.  Section 7426 outlines several categories of available relief, including the return of property.  Thus, if a court determines that a levy is wrongful, it may "(A) order the return of specific property if the United States is in possession of such property" or "(B) grant a judgment for the amount of money levied upon."  26 U.S.C. § 7426(b)(2)(A)-(B).  This statute also provides that when a court enters judgment pursuant to Section 7426(b)(2)(B), "[i]nterest shall be allowed at the overpayment rate established under [S]ection 6621 . . . from the date the Secretary receives the money wrongfully levied upon to the date of payment of such judgment."[25]  26 U.S.C. § 7426(g)(1).  Having found that the alter-ego levy was wrongful, judgment will be entered in favor of NQGRG and against the United States in the amount of the levied funds ($1,543,929.29).  26 U.S.C. § 7426(b)(2)(B). The parties dispute the availability of interest based on their differing positions as to whether the United States has "receive[d]" the levied funds.  26 U.S.C. § 7426(g)(1); ECF No. 152 at 32–35; ECF No. 153 at 26–32.  The United States posits that the "funds remain frozen in [NQGRG's] operating account and were never remitted to the IRS" (ECF No. 152 at 32), whereas NQGRG

---

[25]  26 U.S.C. § 7426 also permits an award of "actual, direct economic damages" and litigation costs in cases where there is a finding that an IRS employee or officer recklessly, intentionally, or negligently disregarded any provision of Title 26, United States Code. 26 U.S.C. § 7426(h)(1)(A)-(B).  NQGRG sought damages and costs in the prayer for relief section of its Complaint.  ECF No. 1 at 19.  The Court granted summary judgment in favor of the United States on NQGRG's damages claim because NQGRG did not exhaust the available administrative remedies in the manner specified by the statute and its implementing regulations. *Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, Civil Action No. EA-22-2129, 2024 WL 3234000, at *11-13 (D. Md. June 28, 2024) (*NQGRG I*), *reconsideration denied*, 2025 WL 659546 (D. Md. Feb. 28, 2025); 26 U.S.C. §§ 7426(h)(2), 7433(d)(1); 26 C.F.R. § 301.7426-2(b)-(d).  The same failure to exhaust also renders unavailable NQGRG's petition for reasonable litigation costs.  26 U.S.C. §§ 7426(h)(1)-(2), 7433(d)(1); ECF No. 1 at 19.

contends that the United States has "possess[ed] and control[ed] the levy proceeds for nearly four years" (ECF No. 153 at 26).

The evidence reveals that upon receipt of the alter-ego levy, PNC Bank "froze" funds held in NQGRG's operating account in the amount of $1,543,929.29.  ECF No. 149 at 164:9–12.  PNC Bank was scheduled to send the levied funds to the IRS on June 3, 2022, but it did not do so pursuant to the IRS's instruction.  ECF No. 148 at 54:17–23; JX-022 at 0246.  Ms. Kennedy twice directed PNC bank to hold the levied funds until it received further direction from the IRS.  ECF No. 148 at 48:19–24; JX-022 at 0246, 0258–0259.  If Ms. Kennedy had not issued these directives, PNC Bank would have remitted the funds to the IRS.  ECF No. 148 at 54:17–23.  Although NQGRG asked that the funds not be remitted to the IRS pending resolution of its Collection Appeal Request, it did not ask the IRS to "freeze" the funds until the conclusion of this litigation.  ECF No. 127-1 ¶ 74; ECF No. 149 at 165:3–5; JX-028 at 0320.  The levied funds therefore remain at PNC Bank because of the IRS's directives.

The United States contends that it does not have actual possession of the levied funds and that constructive possession is not equivalent to receipt, which is the prerequisite to an interest award under Section 7426(g)(1).  ECF No. 152 at 33.  The United States relies on an out-of-circuit decision that rejected the argument that "the date of receipt should be treated as the date on which the [IRS] took constructive possession of the funds i.e., the date of levy."  *Hammond Co.* v. *United States*, 568 F. Supp. 309, 312 (S.D. Cal. 1983).  The undersigned concurs with the foundational premise outlined in that decision, namely that Section 7426 is a limited waiver of sovereign immunity that must be strictly construed in favor of the United States.[26]  *Id.*; *see also*

---

[26]  The undersigned also concurs that the date of levy is not the correct trigger date for the interest calculation because issuance of the notice of levy cannot equate to receipt of the levied funds due to the 21-day waiting period before the levy recipient can transmit funds to the IRS. *See* II.F., *supra*; *Hammond Co.* v. *United States*, 568 F. Supp. 309, 312 (S.D. Cal. 1983).

*NQGRG I*, 2024 WL 3234000, at \*12 (discussing Section 7426's limited waiver of sovereign immunity in the context of a claim for damages).  Precisely because the statutory language at issue is "clear and unambiguous," *Hammond Co.*, 568 F. Supp. 312, as is required for a waiver of sovereign immunity, the undersigned does not find the remainder of the decision persuasive. A substantial portion of the Court's reasoning rests on legislative history.  *Id.* at 312-313.  Yet, as the Supreme Court has cautioned, "legislative history is not the law."  *Azar* v. *Allina Health Servs.*, 587 U.S. 566, 579 (2019).  "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.  Where . . . that examination yields a clear answer, judges must stop."  *Food Mktg. Inst.* v. *Argus Leader Media*, 588 U.S. 427, 436 (2019) (internal citation omitted); *see also In re Tucker*, 653 B.R. 598, 607 (D. Md. 2023) (Chasanow, J.) ("Federal courts use legislative history to 'illuminate ambiguous text,' not to 'muddy clear statutory language.'") (quoting *Milner* v. *Department of Navy*, 562 U.S. 562, 572 (2011)).

Here, the statutory language is clear.  When judgment is entered, subsection (g)(1) allows an award of interest "from the date the Secretary receives the money wrongfully levied upon to the date of payment of such judgment."  26 U.S.C. § 7426(g)(1).  The parties dispute the meaning of the word "receives," which is not defined in the statute.  "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  *Perrin* v. *United States*, 444 U.S. 37, 42 (1979). "Receive" means "to take or come into possession of."  WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 714 (1965) (definition 1).[27]  "Take" means "to get . . . into one's possession, power,

---

[27]  The undersigned consulted a historical dictionary because 26 U.S.C. § 7426 was enacted in 1966, Federal Tax Lien Act of 1966, Pub. L. No. 89-719, 80 Stat. 1144, and *Perrin* v. *United States* calls for the evaluation of a word's "contemporary" meaning.  444 U.S. 37, 42 (1979) (examining the meaning of the term at the time the statute became law).

or control." *Id.* at 898 (definition 1). "Possession" means "the act of having or taking control" and "control . . . of property without regard to ownership." *Id.* at 663 (definitions 1a, 1b). Taken as a whole, these definitions boil down to the concept of functional control. As a verb, the word "control" means "to have power over." *Id.* (definition 2b). Thus, the Secretary "receives" the levied funds when the Secretary exercises power and control over them.

It is evident in the case at bar that, both legally and factually, the United States has control of the levied funds and thus has received said funds within the meaning of Section 7426(g)(1). "The term 'levy' . . . includes the power of distraint and seizure by any means."[28] 26 U.S.C. § 6331(b); *see also* 26 U.S.C. § 7701(a)(21). As the Supreme Court has explained, "real estate and personal property, tangible and intangible, are subject to levy." *G. M. Leasing Corp.*, 429 U.S. at 350. "Because intangible property is not susceptible of physical seizure, posting, or tagging, levy upon it is effected by serving the appropriate form upon the party holding the property or rights to property." *Id.*; *Phelps* v. *United States*, 421 U.S. 330, 337 (1975) ("Historically, service of notice has been sufficient to seize a debt.") (citing *Miller* v. *United States*, 11 Wall. 268, 297 (1871)). Thus, a notice of levy, which the IRS issued to PNC Bank on May 12, 2022, was "equivalent to a seizure" and gave "the United States full legal right" to the levied funds. *Phelps*, 421 U.S. at 337. The notice of levy also "creates a custodial relationship between the person holding the property and the IRS so that the property comes into the constructive possession of the Government." *National Bank of Com.*, 472 U.S. at 720-721.

These principles are clearly illustrated in this case where the evidence conclusively establishes that the IRS directed the disposition of the contested funds. The IRS noticed a levy, which attached to and seized (or froze) the funds in NQGRG's operating account. PNC Bank

---

[28]  Synthesis of the definitions of "distraint," "distrain" (definitions 1, 2), and "distress" reveals that the word "distraint" means that act of seizing and detaining. WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 243 (1965).

was poised to remit the levied funds to the IRS on June 3, 2022.  It did not do so only because the IRS twice directed PNC Bank to hold the funds until further notice.  NQGRG's requests with respect to the levied funds were denied, and the actions of PNC Bank were dictated by the IRS.  The United States cannot credibly assert that by levying upon the funds it has not taken control of them.  It has therefore received the funds within the meaning of Section 7426(g)(1), thus triggering an award of interest.  In terms of the operative date of receipt, the undersigned concludes that but for the directives of Ms. Kennedy, the levied funds would have been remitted to the IRS on June 3, 2022, once the 21-day waiting period had expired.  Interest will therefore begin to accrue as of that date.  26 U.S.C. § 7426(g).

## IV.    CONCLUSION

For the foregoing reasons, the Court finds the United States liable as to NQGRG's wrongful levy claim.  Judgment will be entered in favor of NQGRG and against the United States in the amount of $1,543,929.29.  Interest shall accrue on this amount at the overpayment rate established under 26 U.S.C. § 6621(a)(1) from June 3, 2022, to the date of payment of the judgment.[29]  26 U.S.C. § 7426(g)(1).  A separate Order follows.


Date:  May 26, 2026                                          /s/
                                                    Erin Aslan
                                                    United States Magistrate Judge

---

[29]  The overpayment rate is "the sum of . . . the Federal short-term rate . . . , plus . . . 3 percentage points (2 percentage points in the case of a corporation)."  26 U.S.C. § 6621(a)(1).